UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| | * | CIVIL ACTION |
| WALTER BLOCK | * | NO. 14-2200 |
| | * | |
| VERSUS | * | SECTION "B" |
| | * | HON. IVAN L.R. LEMELLE |
| THE NEW YORK TIMES COMPANY, | * | |
| SAM TANENHAUS, and | * | |
| JIM RUTENBERG | * | MAG. JUDGE "4" |
| | * | HON. KAREN WELLS ROBY |
| | * | |

## MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE

Defendants The New York Times Company, Sam Tanenhaus, and Jim Rutenberg (collectively, "Defendants") respectfully submit this memorandum in support of their special motion to strike the complaint of Plaintiff Walter Block ("Professor Block").

## INTRODUCTION

On January 25, 2014, Defendants published in The New York Times newspaper an examination of the intellectual underpinnings of the libertarian philosophy endorsed by Rand Paul, a United States Senator from the State of Kentucky.[1]  The article, titled "Rand Paul's Mixed Inheritance," focuses on the views of libertarian thinkers and academics that have played influential roles in Paul's intellectual circle, and asks whether these views will impact Paul's viability as a serious presidential candidate.

---

[1] Sam Tanenhaus and Jim Rutenberg, *Rand Paul's Mixed Inheritance*, N.Y. Times, January 25, 2014, *available at* http://www.nytimes.com/2014/01/26/us/politics/rand-pauls-mixed-inheritance.html (last visited March 5, 2015). The article is Exhibit A to the Declaration of Sam Tanenhaus, attached.

The article surveys noteworthy figures of the libertarian movement.  One such figure is Professor Block.  Professor Block is a fellow of the Mises Institute, a libertarian organization that champions an unrestricted free market.  The profile quotes Professor Block as saying the only problem with slavery was it was involuntary; the daily life of a slave was "not so bad – you pick cotton and sing songs."[2]

In his complaint, Professor Block alleges Defendants defamed him and portrayed him in a false light, and thus are liable to him for damages.[3]  By his own admission, Professor Block's claims are for defamation by implication.  Specifically, Professor Block alleges the article uses "innuendo" and takes his words "out of context" to paint him as a racist.[4]

The Louisiana Supreme Court has expressly held that there can be no defamation by implication where the publication in question involves a matter of public concern.  Because the article's subject matter — the intellectual roots of the political views of a United States Senator and potential presidential candidate — is indisputably a matter of public concern, Professor Block cannot recover for defamation by implication here.

Moreover, Professor Block cannot prove falsity, an essential element of both his defamation and false light claims. The article merely repeats sentiments Professor Block has expressed fervently and repeatedly elsewhere.  Indeed, Professor Block made the exact same assertions regarding slavery in blog posts he personally wrote both before and after the article was published.

---

[2] *Id.* p. 3.

[3] Complaint at ¶¶ 15-22.

[4] Complaint at ¶ 10.

Under Louisiana law, a defendant may move, at the outset of a case, to strike claims that arise from the defendant's exercise of First Amendment rights.[5]  In the face of such a motion, the plaintiff has the burden to demonstrate a probability of success on his claims.  *Henry v. Lake Charles American Press, L.L.C.*, 566 F.3d 164, 181 (5th Cir. 2009).  Professor Block cannot demonstrate a probability of success on his claims for the reason, among others, that he cannot prove falsity.  Defendants, accordingly, move the Court to strike Professor Block's complaint.

Below Defendants summarize the relevant facts, showing that Professor Block has long engaged in public academic and popular debates on the issue of slavery and espoused the very views attributed to him in the article; the article does not misrepresent Professor Block's views; and Professor Block's personal response to the article only confirms the article's accuracy.  Defendants next show that in the face of their motion Professor Block has a burden to demonstrate, at the outset of his case, a probability of success on his claims.  Defendants then argue that Professor Block cannot carry his burden as to either of his claims for the reason, among others, that he cannot prove falsity.

## FACTS

Professor Block has long held controversial views, and the article does not misrepresent those views.  Indeed, Professor Block's personal response to the article only confirms the article's accuracy.

### Professor Block has long held controversial views.

Professor Block is no stranger to controversy.  Indeed, he seems to have basked in it over many years of speeches, articles, interviews, and commentary about issues of race and slavery.

---

[5] La. Code Civ. Pro. art. 971.

3

In 2008, in a lecture at Loyola University in Baltimore, Professor Block opined that women and blacks earn less than white men because they are less productive.  He argued that women are less productive because they are distracted by domestic chores; blacks, he suggested, may have lower IQs.  Not surprisingly, Professor Block's comments "ignite[d] furor."[6]  In an op-ed piece, The Times-Picayune published the following commentary on Professor Block's comments:

> It is a blessing that women are so average, the way Block sees it, because that means the vast majority of them are capable of handling the responsibilities of motherhood and have thus ensured the success of homo sapiens.
>
> Women are less productive in the workplace than men because of the time they devote to those duties and to domestic chores, according to Block. As evidence for this thesis, he notes that among 18-24 year olds, and workers who have never married, income disparity is virtually non-existent.
>
> If women were being paid less for the same amount of work, employers would rush to hire them and the profit motive would iron out the gender differential, Block says. That is not an unpersuasive argument, although one to which liberal orthodoxy is unlikely to warm.
>
> Discounting the effects of sexism might have been incendiary enough, but then came question time. In Block's view, black workers, like female workers, would be in great demand if they really were being paid less for producing the same as their white counterparts.
>
> Asked to explain the racial gap, Block said he was just an economist and unqualified to say.
>
> But he advised that there are two theories: "The politically correct answer is that lower black productivity is due to slavery, Jim Crow legislation, poor treatment of African-Americans in terms of schooling, etc. The politically incorrect explanation was supplied by Richard Herrnstein and Charles Murray in their book 'The Bell Curve': lower black IQs."[7]

---

[6]James Gill, "James Gill: Loyola economics chair Walter Block ignites furor for asserting that women, blacks less productive in workplace,"  The Times-Picayune | Nola.com, November 26, 2008, *available at* http://blog.nola.com/jamesgill/2008/11/a_tough_sell_in_the_marketplac.html (last visited March 5, 2015).  The article is Exhibit A to the Declaration of Lori Mince, attached.
[7] *Id.*

Professor Block's views of slavery and, relatedly, the Civil Rights Act are also controversial. On February 25, 2013, Professor Block published a blog post titled "Chris Selley Is A Pussy Libertarian; I'm Not," on the website LewRockwell.com. In the blog post, Professor Block stated his belief that slavery was wrong because it was involuntary. Otherwise, he concluded, slavery "wasn't so bad." He further argued that the Civil Rights Act, because it makes service compulsory, makes "partial slaves of the owners of establishments like Woolworths":

> Free association is a very important aspect of liberty. It is crucial. Indeed, its lack was the major problem with slavery. The slaves could not quit. They were forced to "associate" with their masters when they would have vastly preferred not to do so. Otherwise, slavery wasn't so bad. You could pick cotton, sing songs, be fed nice gruel, etc. The only real problem was that this relationship was compulsory. It violated the law of free association, and that of the slaves' private property rights in their own persons. The Civil Rights Act of 1964, then, to a much smaller degree of course, made partial slaves of the owners of establishments like Woolworths.[8]

**The article does not misrepresent Professor Block's views.**

Defendants interviewed, and quoted, Professor Block in connection with an article titled "Rand Paul's Mixed Inheritance," published in The New York Times newspaper on January 25, 2014.[9]

The lengthy article — it is sixteen pages long — focuses on proponents of the libertarian philosophy that shapes Paul's political views and asks whether that philosophy will impact Paul's viability as a presidential candidate. The article discusses the Mises Institute, which was founded by libertarian advocates close to Paul's father and exhibited early influence on a young

---

[8] Walter E. Block, "Chris Selley Is a Pussy Libertarian; I'm not," LewRockwell.com, February 25, 2013, *available at* http://www.lewrockwell.com/2013/02/walter-e-block/chris-selley-is-a-pussy-libertarian-imnot/ (last visited March 5, 2015). The post is Exhibit B to the Declaration of Lori Mince, attached.

To the extent Professor Block disputes the authenticity of his blog posts and other published statements submitted herewith, Defendants request that they be permitted to supplement the record with additional evidence.

[9] Exhibit A to the Declaration of Sam Tananhaus.

Paul, in particular.  The article credits the Mises Institute with fostering a worldview known as "paleolibertarianism."  The article explains that "[s]ome scholars affiliated with the Mises Institute have combined dark biblical prophecy with apocalyptic warnings that the nation is plunging toward economic collapse and cultural ruin.  Others have championed the Confederacy."[10]

The Mises Institute is overseen by Llewellyn H. Rockwell, Jr., a former chief of staff to Ron Paul, a United States Congressman from Texas and Rand Paul's father.[11]  The article reports that "[s]everal current Mises fellows and associates are regulars on the Ron Paul speaking circuit and affiliated with his home-schooling curriculum or foreign policy institute."[12]

Professor Block is a Mises fellow, and the article identifies Professor Block as one of many Mises fellows who holds controversial views. Of Professor Block, the article writes:

> Walter Block, an economics professor at Loyola University in New Orleans who described slavery as "not so bad," is also highly critical of the Civil Rights Act. "Woolworth's had lunchroom counters, and no blacks were allowed," he said in a telephone interview.  "Did they have a right to do that?  Yes, they did.  No one is compelled to associate with people against their will."[13]

Additionally, the article states of Professor Block:

> One economist, while faulting slavery because it was involuntary, suggested in an interview that the daily life of the enslaved was "not so bad — you pick cotton and sing songs."[14]

---

[10] *Id.* at pp. 2-3.

[11] *Id.* at pp. 7-9.

[12] *Id.* at p. 10.

[13] *Id.* at p. 10.

[14] *Id.* at pp. 2-3.

6

**Professor Block's personal response to the article confirms the article's accuracy.**

In his complaint, Professor Block alleges the article's statements about him are "untrue" and have hurt his reputation.[15]  He has publicly admitted, however, that "I did indeed use the exact words the NY Times quoted me as saying."[16]

Furthermore, Professor Block's own published response to the article confirms his views of slavery:  On January 30, 2014, in a blog post Professor Block published on the website EconomicPolicyJournal.com, Professor Block explained that in his conversations with the article's writer, he had used slavery to prove a point. Slavery was wrong, he argued, "only" because it violated what he calls the "Non-Aggression Principle"; otherwise, according to professor Block, it was "innocuous":

> I went so far as to say that the *only* thing horrid about actual slavery was that it violated the [Non-Aggression Principle]. Otherwise, apart from that one thing, slavery was innocuous: you could pick cotton in the healthy outdoors, sing songs, they would give you gruel, etc. This of course was a *hypothetical*. A point made to dramatize exactly why slavery was wrong. Not because of cotton, gruel, singing, etc., but due to the vicious violation of the NAP against innocent black people.[17]

---

[15] Complaint at ¶ 9 ("The statements made about plaintiff and quoted hereinabove are untrue, defamatory and have caused him damages.").

[16] Walter E. Block, "Sue New York Times for libel?!?!," LewRockwell.com, February 1, 2014, at 4:22 p.m., *available at* http://www.lewrockwell.com/lrc-blog/sue-new-york-times-for-libel (last visited March 5, 2015).  The post is Exhibit C to the Declaration of Lori Mince, attached.

That Professor Block "did indeed use the exact words the NY Times quoted [him] as saying" is further supported by the Declaration of Sam Tanenhaus, attached ("The statements that the article attributes to Professor Block are statements that Professor Block personally made to me during the interview.").

[17] Walter Block, "Walter Block: How NYT Mischaracterized My Views on Slavery (And What I Tried To Do About It)," EconomicPolicyJournal.com, January 30, 2014, *available at* http://www.economicpolicyjournal.com/2014/01/walter-block-how-nyt-mischaracterized.html (last visited March 5, 2015).  The post is Exhibit D to the Declaration of Lori Mince, attached.

7

Professor Block re-published the same comments on January 31, 2014, in a blog post on the website LibertyCrier.com.[18]  In a post-script to that blog post, he advised that he had written a letter to the editor of The New York Times in which he advised the newspaper that "long before being interviewed for your story" he "published these exact words on 2/25/13":

> I published these exact words on 2/25/13 long before being interviewed for your story "Rand Paul's Mixed Inheritance," 1/26/14: "Free association is an important aspect of liberty.  It is crucial.  Indeed, its lack was the major problem with slavery.  The slaves could not quit.  They were forced to 'associate' with their masters when they would have vastly preferred not to do so.  Otherwise, slavery wasn't so bad.  You could pick cotton, sing songs, be fed nice gruel, etc. The only real problem was that this relationship was compulsory."[19]

These personal blog posts, among possible others, show that the article's representation of Professor Block's views of slavery are not "untrue."  Professor Block publicly admits — insists, even — that he believes that slavery was wrong because it was involuntary, but otherwise was "not so bad."

Professor Block's response to the article also confirms his views of the Civil Rights Act: An article published on the website UptownMessenger.com reported that "Block took less issue with the presentation of his defense of segregation at Woolworth's lunch counters":

> Private businesses should not be forced to serve anyone against their will — likening the race issues in the 1960s to modern debates over whether Christian wedding venues should be able to turn away homosexual couples marrying. In time, market forces will drive businesses with practices out of step with society out of business, Block said.

> "It is immoral and indecent and improper refuse to serve people due to color of skin, but should it be against the law?" Block asked. "Nobody should be forced to associate against anyone against their will."[20]

---

[18] Walter Block, "Scurrilous, Libelous, Venomous," LibertyCrier.com, January 31, 2014, *available at* http://libertycrier.com/scurrilous-libelous-venomous/ (last visited March 5, 2015).  The post is Exhibit E to the Declaration of Lori Mince, attached.

[19] *Id*.

[20] Robert Morris, "Professor's defense of segregated lunch counters creates controversy at Loyola University," UptownMessenger.com, February 20, 2014, *available at* http://uptownmessenger.com/2014/02/professors-defense-

Finally, on February 4, 2014, in a blog post Professor Block published on Mr. Rockwell's website, LewRockwell.com, he contemplated suing The New York Times, but admitted that he had been told that "I don't have a good case" because "I did indeed use the exact words the NY Times quoted me as saying."  Nevertheless, he concluded, "I very much want to sue them":

> I have also been told that I don't have a good case, since I did indeed use the exact words the NY Times quoted me as saying.  But, I contend, this newspaper took those words completely out of context.  I don't much care if some people think I have a good legal case or not.  I very much want to sue them.[21]

As the foregoing shows, the article's statements about Professor Block are not "untrue." They are consistent with the exact same assertions Professor Block made both before and after the article was published.

## ARGUMENT

In the face of Defendants' motion, Professor Block has the burden to demonstrate a probability of success on his claims.  (Part I)  He cannot carry that burden:  He cannot carry his burden to prove a probability of success on his defamation claim because (i) his complaint alleges defamation by implication, and Louisiana law does not recognize a claim for defamation by implication under the circumstances; (ii) he cannot prove falsity; and (iii) he cannot prove fault.  (Part II.A)   He likewise cannot carry his burden to prove a probability of success on his false light invasion of privacy claim because he cannot prove falsity or fault.   (Part II.B) Because Professor Block cannot carry his burden as to either of his claims, his complaint must be dismissed, and Defendants awarded attorneys fees and costs. (Part III)

---

of-segregated-lunch-counters-creates-controversy-at-loyola-university/ (last visited March 5, 2015). The article is Exhibit F to the Declaration of Lori Mince, attached.

[21] Exhibit C.  *See also* Declaration of Sam Tanenhaus, attached ("The statements that the article attributes to Professor Block are statements that Professor Block personally made to me during the interview.").

## I.     PROFESSOR BLOCK HAS THE BURDEN TO DEMONSTRATE A PROBABILITY OF SUCCESS ON HIS CLAIMS.

The substantive law of Louisiana applies to this diversity action.  *Henry v. Lake Charles American Press, L.L.C.*, 566 F.3d 164, 169 (5th Cir. 2009).  Accordingly, Professor Block's complaint is subject to Louisiana Code of Civil Procedure article 971, Louisiana's anti-SLAPP statute.  *Id.* ("Louisiana law, including the nominally-procedural Article 971, governs this diversity case.").[22]  Pursuant to article 971, a defendant may move to strike claims that arise from the defendant's exercise of First Amendment rights.  To survive such motion, a plaintiff must prove, at the outset of his case, a "probability of success" on his claims:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established a probability of success on the claim.

La. Code Civ. Proc. art. 971(A)(1).  "[A] prevailing party on a special motion to strike shall be awarded reasonable attorneys fees and costs."  *Id.* art. 971(B).

The purpose of article 971 is "to free defendants from the burden and expense of litigation that has the purpose or effect of chilling the exercise of First Amendment rights."  *Henry*, 566 F.3d at 178.  When the Louisiana legislature enacted article 971 in 1999, it stated its intent to protect freedom of speech from abuse of the judicial process:

> The legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances. The legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process.

---

[22] Article 971 is Louisiana's anti-SLAPP statute.  SLAPP is an acronym meaning "strategic lawsuit against public participation." SLAPP lawsuits can have the purpose or effect of chilling the exercise of First Amendment rights.  In response to a growth in SLAPP lawsuits, state legislatures enacted statutes, such as article 971, to provide for the early dismissal of non-meritorious claims.  *See generally Henry v. Lake Charles American Press, L.L.C.*, 566 F.3d 164 (5th Cir. 2009).

Sec. 2 of Acts 1999, No. 734.

The Louisiana legislature instructed that article 971 must be construed broadly, and numerous courts have confirmed that its purpose is to screen out meritless claims pursued to chill one's constitutional rights under the First Amendment of the United States Constitution to freedom of speech and press. *Id.* ("[I]t is the intention of the legislature that the Article enacted pursuant to this Act shall be construed broadly.") (emphasis added). *See also, e.g., Lee v. Pennington*, 830 So. 2d 1037, 1041 (La. App. 4th Cir. 2002), *writ denied*, 836 So. 2d 52 (La. 2003) ("Article 971 was enacted by the legislature as a procedural device to be used early in legal proceedings to screen meritless claims pursued to chill one's constitutional rights under the First Amendment of the United States Constitution to freedom of speech and press."); *Melius v. Keiffer*, 980 So. 2d 167 (La. App. 4th Cir. 2008) ("The Louisiana legislature enacted La. C.C.P. art. 971 'to screen out meritless claims pursued to chill one's constitutional rights under the First Amendment of the United States Constitution to freedom of speech and press.'"); *Lamz v. Wells*, 938 So. 2d 792, 796 (La. App. 1st Cir. 2006) ("The intent of Article 971 is to encourage continued participation in matters of public significance and to prevent this participation from being chilled through an abuse of judicial process."); *Darden v. Smith*, 879 So. 2d 390, 394 (La. App. 3d Cir. 2004) (article 971 was "enacted by the legislature to promote participation in matters of public concern"); *Johnson v. KTBS, Inc.*, 889 So. 2d 329 (La. App. 2d Cir. 2004) (article 971 is "to be used in the early stages of litigation to screen out meritless claims brought primarily to chill the valid exercise of the constitutional rights of freedom of speech"); *Baxter v. Scott*, 847 So. 2d 225, 231-32 (La. App. 2d Cir.), *vacated as moot*, 860 So. 2d 535 (La. 2003) ("Article 971 is a procedural device to be used in the early stages of litigation to screen those claims which lack merit and which would chill public participation in matters of public

11

interest."); *Stern v. Doe*, 806 So. 2d 98, 101 (La. App. 4th Cir. 2001) ("The intent of this statute is to encourage continued participation in matters of public significance and to prevent this participation from being chilled through an abuse of judicial process.").

Article 971, like most anti-SLAPP statutes,[23] operates as a burden-shifting statute.  It requires, first, that the movant-defendant establish that the article applies; that is, the defendant must "make a prima facie showing that the matter arises from an act in furtherance of his or her right of free speech or the right of petition and in relation to a public issue." *Darden*, 879 So. 2d at 396; La. Code Civ. Proc. art. 971(F)(1)(d) ("any conduct in furtherance of the exercise of the constitutional right of free speech in connection with a public issue or an issue of public interest" qualifies for article 971 protection).  After the defendant establishes that the article applies, the burden shifts to the plaintiff to "demonstrate a probability of success on his or her own claim." *Darden*, 879 So. 2d at 396; La. Code Civ. Proc. art. 971(A)(1).

"To establish a probability of prevailing on his claim, a plaintiff must state and substantiate a legally sufficient claim. This is done through a prima facie showing of facts sufficient to sustain a favorable judgment." *Baxter*, 847 So. 2d at 231-32. "This requires more than that which is necessary to survive a normal motion to dismiss, as 'a defamation plaintiff must produce evidence of sufficient quality and quantity to demonstrate that he will be able to meet his burden of proof at trial.'" *Henry*, 566 F.3d at 181 (quoting *Estiverne v. Times-Picayune, L.L.C.*, 950 So.2d 858, 860 (La. App. 4th Cir. 2006)).  Dismissal is warranted if the plaintiff fails to produce sufficient evidence for even a single element of a claim.  *See, e.g., Baxter*, 847 So. 2d

---

[23] Numerous states have enacted anti-SLAPP statutes.  *See Guam Greyhound, Inc. v. Brizill*, 2008 WL 4206682 (Guam Terr. 2008) (noting that 25 states and Guam have enacted some form of anti-SLAPP statute).  *See also* "State Anti-SLAPP Laws," Public Participation Project, Fighting for Free Speech, *available at* http://www.anti-slapp.org/your-states-free-speech-protection/ (last visited March 5, 2015) (reporting that 28 states have enacted some form of anti-SLAPP statute).

at 234 (plaintiff failed to produce sufficient evidence of malice); *Darden*, 879 So. 2d at 393 (same).

A plaintiff faced with a special article 971 motion to strike therefore has a "difficult burden." *Henry*, 566 F.3d at 181 (citation omitted).[24]  A court, in deciding whether that burden has been met, "shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based."  La. Code Civ. Proc. art 971(A)(2); *see also Baxter*, 847 So. 2d at 232.

Here, there can be no dispute that Professor Block's claims arise from an act in furtherance of Defendants' right of free speech, and in relation to a public issue. *See Darden*, 879 So. 2d at 396; La. Code Civ. Proc. art. 971(F)(1)(d).  The publication of a news article is among the purest exercises of the right of free speech, and the article's subject matter — the intellectual forces shaping the political views of a United States Senator and potential candidate for president — is indisputably a matter of public interest.   As a result, Professor Block's claims — for defamation and false light invasion of privacy alike[25] — are subject to article 971.  The burden therefore falls on Professor Block to establish, at the outset of his case, a probability of success on both claims.  For the reasons explained below, Professor Block cannot carry his burden as to either claim.

---

[24] Even prior to the enactment of article 971, Louisiana courts recognized that the "standards use for summary judgment are somewhat higher in defamation suits," *Spears v. McCormick*, 520 So.2d 805, 808 (La. App. 3d Cir. 1987), and that defamation plaintiffs bear "a burden of proof which is more onerous than usual."  *Dwight W. Andrus, Inc. v. Abellor Corp.*, 482 So.2d 1092, 1094 (La. App. 3d Cir. 1986).

[25] Article 971 is not limited to a cause of action in defamation.  *Darden*, 879 So. 2d at 395-96 (La. App. 3d Cir. 2004) ("We find no merit in the plaintiff's contention that Article 971 is limited to a cause of action in defamation….[T]he declaration of legislative intent indicates a desire for the Article to be 'construed broadly.'").

II.   **PROFESSOR BLOCK CANNOT DEMONSTRATE A PROBABILITY OF SUCCESS ON EITHER OF HIS CLAIMS.**

    A.   **HE CANNOT DEMONSTRATE A PROBABILITY OF SUCCESS ON HIS DEFAMATION CLAIM.**

Professor Block cannot demonstrate a probability of success on his defamation claim.  As an initial matter, his complaint alleges defamation by implication, and Louisiana law does not recognize a claim for defamation by implication under the circumstances presented here.

What is more, he cannot prove essential elements of his claim. The elements of defamation under Louisiana law are: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury." *Kennedy v. Sheriff of E. Baton Rouge*, 935 So. 2d 669, 674 (La. 2006).  In view of his own blog posts, Professor Block cannot prove falsity or fault.

    i.   **Louisiana law does not recognize defamation by implication under the circumstances presented in this case.**

Professor Block alleges that the article's statements about him are "untrue" — yet it is clear from his complaint that he really alleges only that the article took his words out of context. Specifically, Professor Block alleges the article uses "innuendo" and takes his words "out of context" to paint him as a racist:

> The quotation above, standing alone, uses innuendo, misquotation and/or quotation out of context to give the impression that plaintiff is a racist, a supporter of slavery, and/or against the Civil Rights Act of 1964 solely because of racial prejudice.[26]

Defamation by "innuendo" or by taking words "out of context" is commonly known as defamation by implication.  Professor Block plainly alleges defamation by implication here.

---

[26] Complaint at ¶ 10.

Louisiana law, however, does not recognize defamation by implication under the circumstances because the statements in question involve matters of public concern. In *Schaefer v. Lynch*, 406 So. 2d 185 (La. 1981), the Louisiana Supreme Court held that a plaintiff cannot recover for defamation by implication where the publication's subject matter involves public officials and public affairs. In *Schaefer*, the plaintiff admitted that facts published by the defendant were true, but complained that the publication falsely implied unethical or unlawful behavior. Reversing the trial court, the Louisiana Supreme Court held: "Where public officers and public affairs are concerned, there can be no libel by innuendo." *Id.* at 188.

Twelve years later, in *Sassone v. Elder*, 626 So. 2d 345, 354 (La. 1993), the Louisiana Supreme Court touched on the issue again, observing that "[w]hen a public figure and matter of public concern are involved, perhaps there can be no defamation by implication." *Id.* at 354.

Six years after *Sassone*, the Louisiana Supreme Court decided *Fitzgerald v. Tucker*, 737 So. 2d 706 (La. 1999). In that case, the Louisiana Supreme Court re-affirmed the rule that a plaintiff cannot recover for defamation by implication, where the publication in question involves matters of public concern: "[T]ruthful facts which carry a defamatory implication can only be actionable if the statements regard a private individual *and* private affairs. 'Where public officers and public affairs are concerned, there can be no libel by innuendo.'" *Id.* at 717 (quoting *Shaefer*) (emphasis in original).

Here, the publication in question indisputably involves matters of public concern: The article is about the intellectual influences surrounding Rand Paul, a United States Senator and potential candidate for president, and focuses on how these influences may shape Paul's expected presidential campaign. Under *Schaefer*, *Sassone*, and *Fitzgerald*, Professor Block cannot recover for defamation by implication.

Because Professor Block's claims — whether pled as defamation or false light invasion of privacy — are, by his own admission, claims for defamation by implication, and because Louisiana law does not recognize defamation by implication under the circumstances, Professor Block cannot demonstrate a probability of success on his defamation claim. For this independent reason, Professor Block's claims must be dismissed.

### ii.  Professor Block cannot prove falsity.

A defamation plaintiff has the burden to prove falsity by a preponderance of the evidence. *Rachal v. Dep't. of Wildlife & Fisheries*, 918 So. 2d 570, 574-75 (La. App. 3d Cir. 2005); *Thompson v. Lee*, 888 So. 2d 300, 304 (La. App. 2d Cir. 2004) (truth is an absolute defense). "Proof by a preponderance of the evidence is sufficient when the evidence, taken as a whole, shows that the fact sought to be proved is more probable than not." *See, e.g., Daniel v. House of Raeford Farms of La.*, 23 So. 3d 374, 379 (La. App. 2d Cir. 2009).

A court, when assessing a statement's falsity, must read the article as a whole. *Britton v. Hustmyre*, 2009-0847 (La. App. 1 Cir. 3/26/10), 2010 WL 1170222, *8 ("[W]hen the statements complained of are read in the context of the magazine article as a whole, and considering the effect the article as a whole would have on the average reader, Mr. Britton's probability of proving falsity has not been established.") (quoting *Sassone*, 626 So. 2d at 352; *Kosmitis v. Bailey*, 685 So. 2d 1177, 1180 (La. 2d Cir. App. 1996); *Taylor v. Town of Arcadia*, 519 So. 2d 303, 306 (La. 2d Cir. App.), *writ denied*, 522 So. 2d 1097 (La. 1988)); *Cortez v. Shirley*, 555 So. 2d 577, 579 (La. App. 1 Cir. 1989) ("To determine if the words can be construed to have a defamatory meaning in relation to plaintiff, the article in question must be viewed as a whole."). A statement is false only if it is "a significant variation from the truth." *Hopkins v. Keith*, 348 So. 2d 999, 1002 (La. App. 2d Cir. 1977).

16

Here, Professor Block's own blog posts conclusively disprove any allegation that the article is false.  As shown herein, Professor Block publicly admits — insists, even — that he believes that "the *only* thing horrid about actual slavery was that it violated the [Non-Aggression Principle]. Otherwise, apart from that one thing, slavery was innocuous: you could pick cotton in the healthy outdoors, sing songs, they would give you gruel, etc." Indeed, Professor Block in a blog post publicly conceded, "**I did indeed use the exact words the NY Times quoted me as saying.**"[27]

In view of the foregoing, Professor Block cannot prove falsity "is more probable than not."  *E.g., Daniel*, 23 So. 3d at 379.  Because he cannot prove this essential element, he cannot demonstrate a probability of success on his defamation claim.  For this independent reason, the claim should be stricken.

### iii.  Professor Block cannot prove fault.

For the same reason Professor Block cannot prove falsity, he also cannot prove fault.  In a case involving speech on a matter of public concern, a public-figure plaintiff such as Professor Block[28] must prove actual malice — that is, that the defendant knew his assertions were false or acted with reckless disregard for the truth.  *Costello v. Hardy*, 864 So. 2d 129, 140-41 (La. 2004).  Actual malice must be proved with clear and convincing evidence.  *Tarpley v. Colfax Chronicle*, 650 So. 2d 738, 740 (La. 1995) (plaintiff must show that the "judge or jury could reasonably find by clear and convincing evidence that the alleged defamatory statements were

---

[27] Exhibit C to Declaration of Lori Mince (emphasis added).  *See also* Declaration of Sam Tanenhaus, attached ("The statements that the article attributes to Professor Block are statements that Professor Block personally made to me during the interview.").

[28] Professor Block is a public figure, at a minimum, for the limited purposes of this lawsuit because he voluntarily injected himself in the public controversy at issue.  *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974) ("In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.").

made with knowing and reckless falsity"); *Kidder v. Anderson*, 354 So. 2d 1306, 1308 (La. 1978) (plaintiff must demonstrate actual malice with clear and convincing proof).

Professor Block cannot prove actual malice at all, much less with clear and convincing evidence.  Professor Block must prove that Defendants knew the article's representations were false or acted with reckless disregard for the truth.  As shown, the article's representations are not false.  Even if they were, given the public record of Professor Block's views, it cannot be said Defendants acted with reckless disregard for the truth.  Before the article was published, Professor Block in a blog post publicly stated his view that slavery was wrong because it was involuntary but otherwise "wasn't so bad"; in the same blog post, he stated his view that the Civil Rights Act, because it makes service compulsory, makes "partial slaves of the owners of establishments like Woolworths."[29]  Because the public record at the time confirmed the article's representations, Professor Block simply cannot prove they acted with reckless disregard for the truth.

Because he cannot prove fault, an essential element, he cannot demonstrate a probability of success on his defamation claim.  For this independent reason, the claim should be stricken.

In summary, Louisiana law does not recognize a claim for defamation by implication under the circumstances, and Professor Block cannot prove falsity or fault, both essential elements of his claim.  For any one of these reasons, Professor Block cannot demonstrate a probability of success on his defamation claim.  The claim, therefore, should be stricken.

---

[29] Exhibit B to Declaration of Lori Mince.

### B.   PROFESSOR BLOCK CANNOT DEMONSTRATE A PROBABILITY OF SUCCESS ON HIS FALSE LIGHT CLAIM.

For the same reasons Professor Block cannot establish a probability of success on his defamation claim, he also cannot establish a probability of success on his false light claim.

The so-called "false-light" invasion of privacy cause of action "arises from publicity which unreasonably places the plaintiff in a false light before the public.  The publicity need not be defamatory in nature, but must be objectionable to a reasonable person under the circumstances and *must contain either falsity or fiction*."   *Perere v. Louisiana Television Broadcasting Corp.*, 721 So. 2d 1075, 1078 (La. App. 1st Cir. 1998) (emphasis added).

The most obvious reason Professor Block cannot prevail in his false-light claim is that the publicity contains neither falsity nor fiction.  As stated elsewhere, the article's statements about Professor Block are not "untrue."   Professor Block publicly admits — insists, even — that he believes that slavery was wrong because it was involuntary but otherwise was "not so bad."  The article's presentation of Professor Block's views is consistent with Professor Block's own presentation of his views in personal blog posts both before and after the article was published. Indeed, as noted above, Professor Block has himself publicly conceded, "**I did indeed use the exact words the NY Times quoted me as saying.**"[30]  Moreover, in actions for "false light," the United State Supreme Court has held that a showing of actual malice is required where the material is a matter of public interest.  *Time, Inc. v. Hill*, 385 U.S. 374 (1967).  As discussed above, Professor Block cannot prove actual malice.  In sum, given that he cannot prove falsity or fault, Professor Block cannot demonstrate a probability of success on his false light claim.

---

[30] Exhibit C to Declaration of Lori Mince (emphasis added).  *See also* Declaration of Sam Tanenhaus, attached ("The statements that the article attributes to Professor Block are statements that Professor Block personally made to me during the interview.").

## III.   DEFENDANTS ARE ENTITLED TO ATTORNEYS FEES AND COSTS.

Because Professor Block cannot carry his burden as to either of his claims, his complaint must be dismissed, and Defendants awarded attorneys fees and costs.

Article 971 provides that "a prevailing party on a special motion to strike shall be awarded reasonable attorneys fees and costs."  La. Code Civ. Pro. art. 971(B).  Such awards are mandatory, *see e.g., Alexanian v. Brown*, No. 07-cv-00806, 2010 WL 103609, at *3 (W.D. La. Jan. 7, 2010) ("The undersigned reads La. C.C.P. art. 971's provision for an award of attorney fees and costs as mandatory — 'a prevailing party in a special motion to strike shall be awarded attorney fees and costs.'"); *Darden*, 879 So. 2d at 400 ("In light of the mandatory language of the article, we award attorney's fees and costs."); *Lee*, 830 So. 2d at 1046 ("[t]he language of the statute is clear that attorney fees *must* be awarded to the prevailing defendant"), and common, *see, e.g., Hebert v. Louisiana Licensed Professional Vocational Rehabilitation Counselors*, 4 So. 3d 1002 (La. App. 3d Cir. 2009) (awarding $2,500 in attorneys fees to party that prevailed only in part in special motion to strike); *Gwandiku v. State Farm Mut. Auto Ins. Co.*, 972 So. 2d 334 (La. App. 3d Cir. 2007) (reversing trial court and increasing attorneys fees award to $4,001.00, plus $739.16 in costs, to party that prevailed in special motion to strike); *Estiverne v. Times–Picayune, L.L.C.*, 950 So. 2d 858 (La. App. 4th Cir. 2006) (awarding $4,000 in attorneys fees to party that prevailed in special motion to strike); *Davis v. Benton*, 874 So. 2d 185, 191 (La. App. 1st Cir. 2004) (noting award of attorney fees is mandatory and awarding $5000 in attorneys fees to party that prevailed in special motion to strike).

Defendants thus are entitled to an award of attorneys fees and costs, in an amount to be proven at a subsequent hearing.

766264v.1

**CONCLUSION**

Defendants have shown that Professor Block cannot succeed on either of his claims.  To the extent Professor Block was injured by Defendants' article, it was not because the article was false.  The article merely introduced Professor Block and his views to a wider audience; it said to a large audience of New York Times readers what Professor Block has repeatedly said to a smaller audience of libertarian-blog readers before.  The choice of words was the Defendants' to make.[31]  Here, however, the words were Professor Block's own.

For all the reasons stated herein, the Court must strike Professor Block's complaint and award Defendants reasonable attorney fees and costs in an amount to be proven.

---

[31] *E.g., Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 685-86 (9th Cir. 1990) ("Complaints or disagreements about choice of language are editorial decisions that do not give rise to liability."); *Janklow v. Newsweek, Inc.*, 788 F. 2d 1300, 1306 (8th Cir. 1986) ("We believe that the First Amendment cautions courts against intruding too closely into questions of editorial judgment, such as the choice of specific words.") (citing *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974)).

Respectfully submitted,

  /s/ Loretta G. Mince
Loretta G. Mince, 25796
Alysson L. Mills, 32904
FISHMAN HAYGOOD, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana  70170-4600
Telephone:  (504) 586-5252
Facsimile:  (504) 586-5250
*Attorneys for Defendants*


**CERTIFICATE OF SERVICE**

I hereby certify that on March 5, 2015, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.


  /s/ Loretta G. Mince

**ATTACHMENTS**

|  |  |
|---|---|
|  | **Declaration of Sam Tanenhaus** |
| Ex. A | Sam Tanenhaus and Jim Rutenberg, *Rand Paul's Mixed Inheritance*, N.Y. Times, January 25, 2014, *available at* http://www.nytimes.com/2014/01/26/us/politics/rand-pauls-mixed-inheritance.html (last visited March 5, 2015) |
|  | **Declaration of Lori Mince** |
| Ex. A | James Gill, "James Gill: Loyola economics chair Walter Block ignites furor for asserting that women, blacks less productive in workplace," The Times-Picayune | Nola.com, November 26, 2008, *available at* http://blog.nola.com/jamesgill/2008/11/a_tough_sell_in_the_marketplac.html (last visited March 5, 2015) |
| Ex. B | Walter E. Block, "Chris Selley Is a Pussy Libertarian; I'm not," LewRockwell.com, February 25, 2013, *available at* http://www.lewrockwell.com/2013/02/walter-e-block/chris-selley-is-a-pussy-libertarian-imnot/ (last visited March 5, 2015) |
| Ex. C | Walter E. Block, "Sue New York Times for libel?!?!," LewRockwell.com, February 1, 2014, at 4:22 p.m., *available at* http://www.lewrockwell.com/lrc-blog/sue-new-york-times-for-libel (last visited March 5, 2015) |
| Ex. D | Walter Block, "Walter Block: How NYT Mischaracterized My Views on Slavery (And What I Tried To Do About It)," EconomicPolicyJournal.com, January 30, 2014, *available at* http://www.economicpolicyjournal.com/2014/01/walter-block-how-nyt-mischaracterized.html (last visited March 5, 2015) |
| Ex. E | Walter Block, "Scurrilous, Libelous, Venomous," LibertyCrier.com, January 31, 2014, *available at* http://libertycrier.com/scurrilous-libelous-venomous/ (last visited March 5, 2015) |
| Ex. F | Robert Morris, "Professor's defense of segregated lunch counters creates controversy at Loyola University," UptownMessenger.com, February 20, 2014, *available at* http://uptownmessenger.com/2014/02/professors-defense-of-segregated-lunch-counters-creates-controversy-at-loyola-university/ (last visited March 5, 2015) |