|  |  |  |
|---|---|---|
| | * | |
| | * | CIVIL ACTION |
| WALTER BLOCK | * | NO. 14-2200 |
| | * | |
| VERSUS | * | SECTION "B" |
| | * | HON. IVAN L.R. LEMELLE |
| THE NEW YORK TIMES COMPANY, | * | |
| SAM TANENHAUS, and | * | |
| JIM RUTENBERG | * | MAG. JUDGE "4" |
| | * | HON. KAREN WELLS ROBY |
| | * | |

■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■

## MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE

Defendants The New York Times Company, Sam Tanenhaus, and Jim Rutenberg (collectively, "The New York Times") respectfully re-urge their special motion to strike the complaint of Plaintiff Walter Block ("Professor Block") and submit this memorandum in support.

## INTRODUCTION

This Court is already familiar with the allegations and arguments in this case. Professor Block alleges The New York Times defamed him and cast him in a false light by quoting him "out of context" in an article The New York Times published in January 2014.[1] He claims the article, through "innuendo," painted him as a proponent of slavery and therefore as a racist.[2]

The New York Times moved to dismiss Professor Block's complaint pursuant to Louisiana Code of Civil Procedure article 971 ("Article 971"). Article 971 provides that a

---

[1] R. Doc. 1 at ¶¶ 10, 15-22.
[2] R. Doc. 1 at ¶ 10.

defendant may file a special motion to strike claims that arise from the defendant's exercise of First Amendment rights. To survive a special motion to strike, a plaintiff must prove, at the outset of his case, a "probability of success" on his claims. The New York Times argued that, considering the article as a whole and Professor Block's self-published views, Professor Block could not prove a "probability of success" on his claims. Specifically, The New York Times argued Professor Block could not establish defamatory meaning, falsity, or actual malice, all essential elements of his claims.

This Court agreed. The Court rejected Professor Block's argument that the article is defamatory *per se*. The Court concluded the article did not carry the defamatory meaning that Professor Block assigned to it: The article does not call Professor Block a proponent of slavery or a racist; instead, it states that Professor Block "objects to slavery on principle as involuntary" and "objects to the [Civil Rights] Act on the basis of the constitutional right to be free from association."[3]

As for falsity and actual malice, the Court held that because the article is not false, Professor Block cannot establish either element: "Although Block claims in the Original Complaint that the statements about him and quoted are untrue, he acknowledges having made them, and thus cannot establish the most important element, falsity, which in turn precludes him from establishing malice."[4] The Court further expressly found that Professor Block had offered no evidence of actual malice: "[T]he Court finds no evidence to suggest that the defendants acted with actual malice in publishing the article. Defendants contacted Block for an interview and quoted him directly."[5]

---

[3] R. Doc. 23 at pp. 9-10 ("The text, taken to the extreme, would merely support an accusation that Block supports free enterprise at all cost.").

[4] R. Doc. 23 at p. 11.

[5] R. Doc. 23 at p. 12.

1039348v.1

Professor Block appealed the Court's ruling to the Fifth Circuit. While the appeal was pending, the Fifth Circuit decided *Lozovyy v. Kurtz,* in which it held a non-movant's burden in opposing a special motion to strike under Article 971 is the same as a non-movant's burden in opposing a motion for summary judgment under Federal Rule of Civil Procedure 56. 813 F.3d 576 (5th Cir. 2015). The Fifth Circuit concluded that "the Louisiana Supreme Court would recognize that Article 971's 'probability of success' standard does not permit courts to weigh evidence, assess credibility, or resolve disputed issues of material fact." *Id.* at 568. Consistent with Rule 56, to survive an Article 971 special motion to strike post-*Lozovyy*, a plaintiff need only establish a genuine dispute of material fact as to each element of his claims.

In view of its decision in *Lozovyy*, the Fifth Circuit remanded this case to this Court for reconsideration under the newly announced standard. The Fifth Circuit instructed that on remand this Court "should consider whether Block has established a genuine dispute of material fact on each element of his claims." *Block v. Tannenhaus*, 815 F.3d 218, 221 (5th Cir. 2016).

The New York Times submits that the Court did not resolve disputed questions of fact in its prior ruling. The Court's conclusion did not require it to weigh evidence or assess credibility; instead the Court decided questions committed to a court, applying well-established law, or relied on conceded facts not in dispute. While the Court did not expressly ask whether Professor Block established a genuine issue of material fact, the result is the same: The undisputed facts and law foreclose Professor Block's claims. The article's statements about Professor Block are not "untrue." They are consistent with the exact same assertions Professor Block made both before and after the article was published. Considering the article as a whole and Professor Block's self-published views, there is no genuine issue of material fact as to whether Professor Block can prove falsity, defamatory meaning, or actual malice. Furthermore, Professor Block's

claims are necessarily claims for defamation by implication, a cause of action that does not exist in Louisiana in cases involving matters of public concern.

## FACTS

The heart of Professor Block's claim is that his reputation was injured when The New York Times published — accurately — his views. But Professor Block has long held controversial views, and the article does not misrepresent those views. Indeed, Professor Block's personal response to the article only confirms the article's accuracy.

### Professor Block has long held controversial views.

Professor Block is no stranger to controversy. He seems to have basked in it over many years of speeches, articles, interviews, and commentary about issues of race and slavery.

In 2008, in a lecture at Loyola University in Baltimore, Professor Block opined that women and blacks earn less than white men because they are less productive. He argued that women are less productive because they are distracted by domestic chores; blacks, he suggested, may have lower IQs. Not surprisingly, Professor Block's comments "ignite[d] furor."[6] In an op-ed piece, The Times-Picayune published the following commentary on Professor Block's comments:

> It is a blessing that women are so average, the way Block sees it, because that means the vast majority of them are capable of handling the responsibilities of motherhood and have thus ensured the success of homo sapiens.

> Women are less productive in the workplace than men because of the time they devote to those duties and to domestic chores, according to Block. As evidence for this thesis, he notes that among 18-24 year olds, and workers who have never married, income disparity is virtually non-existent.

---

[6]James Gill, "James Gill: Loyola economics chair Walter Block ignites furor for asserting that women, blacks less productive in workplace," The Times-Picayune | Nola.com, November 26, 2008, *available at* http://blog.nola.com/jamesgill/2008/11/a_tough_sell_in_the_marketplac.html (last visited March 5, 2015). The article is Exhibit A to the Declaration of Lori Mince, attached.

If women were being paid less for the same amount of work, employers would rush to hire them and the profit motive would iron out the gender differential, Block says. That is not an unpersuasive argument, although one to which liberal orthodoxy is unlikely to warm.

Discounting the effects of sexism might have been incendiary enough, but then came question time. In Block's view, black workers, like female workers, would be in great demand if they really were being paid less for producing the same as their white counterparts.

Asked to explain the racial gap, Block said he was just an economist and unqualified to say.

But he advised that there are two theories: "The politically correct answer is that lower black productivity is due to slavery, Jim Crow legislation, poor treatment of African-Americans in terms of schooling, etc. The politically incorrect explanation was supplied by Richard Herrnstein and Charles Murray in their book 'The Bell Curve': lower black IQs."[7]

Professor Block's views of slavery and, relatedly, the Civil Rights Act are also controversial.  On February 25, 2013, Professor Block published a blog post titled "Chris Selley Is A Pussy Libertarian; I'm Not," on the website LewRockwell.com.  In the blog post, Professor Block stated his belief that slavery was wrong because it was involuntary.  Otherwise, he concluded, slavery "wasn't so bad."  He further argued that the Civil Rights Act, because it makes service compulsory, makes "partial slaves of the owners of establishments like Woolworths":

Free association is a very important aspect of liberty. It is crucial. Indeed, its lack was the major problem with slavery. The slaves could not quit. They were forced to "associate" with their masters when they would have vastly preferred not to do so. Otherwise, slavery wasn't so bad. You could pick cotton, sing songs, be fed nice gruel, etc. The only real problem was that this relationship was compulsory. It violated the law of free association, and that of the slaves' private property rights in their own persons. The Civil Rights Act of 1964, then, to a much smaller

---

[7] *Id*.

degree of course, made partial slaves of the owners of establishments like Woolworths.[8]

**The article does not misrepresent Professor Block's views.**

Defendants interviewed, and quoted, Professor Block in connection with an article titled "Rand Paul's Mixed Inheritance," published in The New York Times newspaper on January 25, 2014.[9]

The article focuses on proponents of the libertarian philosophy that shapes Paul's political views and asks whether that philosophy will impact Paul's viability as a presidential candidate. The article discusses the Mises Institute, which was founded by libertarian advocates close to Paul's father and exhibited early influence on a young Paul, in particular. The article credits the Mises Institute with fostering a worldview known as "paleolibertarianism." The article explains that "[s]ome scholars affiliated with the Mises Institute have combined dark biblical prophecy with apocalyptic warnings that the nation is plunging toward economic collapse and cultural ruin. Others have championed the Confederacy."[10]

The Mises Institute is overseen by Llewellyn H. Rockwell, Jr., a former chief of staff to Ron Paul, a United States Congressman from Texas and Rand Paul's father.[11] The article reports that "[s]everal current Mises fellows and associates are regulars on the Ron Paul speaking circuit and affiliated with his home-schooling curriculum or foreign policy institute."[12]

Professor Block is a Mises fellow, and the article identifies Professor Block as one of many Mises fellows who holds controversial views. Of Professor Block, the article writes:

---

[8] Walter E. Block, "Chris Selley Is a Pussy Libertarian; I'm not," LewRockwell.com, February 25, 2013, *available at* http://www.lewrockwell.com/2013/02/walter-e-block/chris-selley-is-a-pussy-libertarian-imnot/ (last visited March 5, 2015). The post is Exhibit B to the Declaration of Lori Mince, attached.

[9] Exhibit A to the Declaration of Sam Tananhaus.

[10] *Id.* at pp. 2-3.

[11] *Id.* at pp. 7-9.

[12] *Id.* at p. 10.

One economist, while faulting slavery because it was involuntary, suggested in an interview that the daily life of the enslaved was "not so bad — you pick cotton and sing songs."[13]

Additionally, the article states of Professor Block:

Walter Block, an economics professor at Loyola University in New Orleans who described slavery as "not so bad," is also highly critical of the Civil Rights Act. "Woolworth's had lunchroom counters, and no blacks were allowed," he said in a telephone interview. "Did they have a right to do that? Yes, they did. No one is compelled to associate with people against their will."[14]

**Professor Block's personal response to the article confirms the article's accuracy.**

In his complaint, Professor Block alleges the article's statements about him are "untrue" and have hurt his reputation.[15] He has publicly admitted, however, that "I did indeed use the exact words the NY Times quoted me as saying."[16]

Furthermore, Professor Block's own published response to the article confirms his views of slavery: On January 30, 2014, in a blog post Professor Block published on the website EconomicPolicyJournal.com, Professor Block explained that in his conversations with The New York Times' reporter, he had used slavery to prove a point. Slavery was wrong, he argued, "only" because it violated what he calls the "Non-Aggression Principle"; otherwise, according to Professor Block, slavery was "**innocuous**":

I went so far as to say that the *only* thing horrid about actual slavery was that it violated the [Non-Aggression Principle]. Otherwise, apart from that one thing, slavery was innocuous: you could pick cotton in the healthy outdoors, sing songs,

---

[13] *Id.* at pp. 2-3.

[14] *Id.* at p. 10.

[15] R. Doc. 1 at ¶ 9 ("The statements made about plaintiff and quoted hereinabove are untrue, defamatory and have caused him damages.").

[16] Walter E. Block, "Sue New York Times for libel?!?!," LewRockwell.com, February 1, 2014, at 4:22 p.m., *available at* http://www.lewrockwell.com/lrc-blog/sue-new-york-times-for-libel (last visited March 5, 2015). The post is Exhibit C to the Declaration of Lori Mince, attached.

That Professor Block "did indeed use the exact words the NY Times quoted [him] as saying" is further supported by the Declaration of Sam Tanenhaus, attached ("The statements that the article attributes to Professor Block are statements that Professor Block personally made to me during the interview.").

1039348v.1

they would give you gruel, etc. This of course was a *hypothetical*. A point made to dramatize exactly why slavery was wrong. Not because of cotton, gruel, singing, etc., but due to the vicious violation of the NAP against innocent black people.[17]

Professor Block re-published the same comments on January 31, 2014, in a blog post on the website LibertyCrier.com.[18] In a post-script to that blog post, he advised that he had written a letter to the editor of The New York Times in which he advised the newspaper that "long before being interviewed for your story" he "published these exact words on 2/25/13":

I published these exact words on 2/25/13 long before being interviewed for your story "Rand Paul's Mixed Inheritance," 1/26/14: "Free association is an important aspect of liberty. It is crucial. Indeed, its lack was the major problem with slavery. The slaves could not quit. They were forced to 'associate' with their masters when they would have vastly preferred not to do so. **Otherwise, slavery wasn't so bad. You could pick cotton, sing songs, be fed nice gruel, etc. The only real problem was that this relationship was compulsory.**"[19]

These personal blog posts, among others, show that the article's representation of Professor Block's views of slavery are not "untrue." Professor Block publicly admits — insists, even — that he believes that the "only" thing wrong with slavery was it was involuntary, but otherwise slavery was "not so bad."

Professor Block's response to the article also confirms his views of the Civil Rights Act: An article published on the website UptownMessenger.com reported that "Block took less issue with the presentation of his defense of segregation at Woolworth's lunch counters":

Private businesses should not be forced to serve anyone against their will — likening the race issues in the 1960s to modern debates over whether Christian

---

[17] Walter Block, "Walter Block: How NYT Mischaracterized My Views on Slavery (And What I Tried To Do About It)," EconomicPolicyJournal.com, January 30, 2014, *available at* http://www.economicpolicyjournal.com/2014/01/walter-block-how-nyt-mischaracterized.html (last visited March 5, 2015). The post is Exhibit D to the Declaration of Lori Mince, attached.

[18] Walter Block, "Scurrilous, Libelous, Venomous," LibertyCrier.com, January 31, 2014, *available at* http://libertycrier.com/scurrilous-libelous-venomous/ (last visited March 5, 2015). The post is Exhibit E to the Declaration of Lori Mince, attached.

[19] *Id.* (emphasis added).

wedding venues should be able to turn away homosexual couples marrying. In time, market forces will drive businesses with practices out of step with society out of business, Block said.

"It is immoral and indecent and improper refuse to serve people due to color of skin, but should it be against the law?" Block asked. "Nobody should be forced to associate against anyone against their will."[20]

Finally, on February 4, 2014, in a blog post Professor Block published on Mr. Rockwell's website, LewRockwell.com, he contemplated suing The New York Times, but admitted that he had been told that "I don't have a good case" because "I did indeed use the exact words the NY Times quoted me as saying." Nevertheless, he concluded, "I very much want to sue them":

> I have also been told that I don't have a good case, since I did indeed use the exact words the NY Times quoted me as saying. But, I contend, this newspaper took those words completely out of context. I don't much care if some people think I have a good legal case or not. I very much want to sue them.[21]

## ARGUMENT

Post-*Lozovyy*, the non-movant's burden under Article 971 is functionally equivalent to the non-movant's burden under Rule 56. *See Block*, 815 F.3d at 221 (citing *Lozovyy*, 813 F.3d at 568). Accordingly, in the face of The New York Times' motion, Professor Block has the burden to establish a genuine issue of material fact as to each element of his claims. Nothing in The New York Times' prior-filed motion, or in this Court's ruling thereon, was inconsistent with that standard. As shown, the undisputed facts and law foreclose Professor Block's claims. (Part I)

Professor Block cannot carry his burden to establish a genuine issue of material fact as to three essential elements of his claims. (Part II) Considering the article as a whole and Professor

---

[20] Robert Morris, "Professor's defense of segregated lunch counters creates controversy at Loyola University," UptownMessenger.com, February 20, 2014, *available at* http://uptownmessenger.com/2014/02/professors-defense-of-segregated-lunch-counters-creates-controversy-at-loyola-university/ (last visited March 5, 2015). The article is Exhibit F to the Declaration of Lori Mince, attached.

[21] Exhibit C. *See also* Declaration of Sam Tanenhaus, attached ("The statements that the article attributes to Professor Block are statements that Professor Block personally made to me during the interview.").

Block's self-published views, the article is not false, therefore there is no genuine issue of material fact as to falsity, an essential element of both Professor Block's defamation and false light claims. (Part II.A)

There also is no genuine issue of material fact as to defamatory meaning, an essential element of Professor Block's defamation claim. The article objectively does not carry the meaning Professor Block assigns to it; it neither states, nor implies, that Professor Block is an advocate of slavery or a racist. (Part II.B.i) Separately, under Louisiana law, a plaintiff can recover for defamation by implication only where private individuals and private affairs are concerned. Because Professor Block's claim is necessarily for defamation by implication, and because his claim does not involve private individuals and private affairs, Louisiana law forecloses Professor Block's defamation claim. (Part II.B.ii)

Finally, there is no genuine issue of material fact as to actual malice, an essential element of both Professor Block's defamation and false light claims. Professor Block must prove The New York Times either knew the article's representations were false or acted with reckless disregard for the truth. As shown, the article is not false. Further, there is no evidence The New York Times, in publishing the article, acted with actual malice. Professor Block concedes that he used the "exact words" attributed to him. He must also acknowledge that the article's two passages, when read together, truthfully convey his view that the problem with slavery was it was "involuntary," otherwise it was "not so bad." What Professor Block really contends, then, is not that the article was untrue but that The New York Times did not present his views as directly or clearly as he would have liked. His contention arguably supports negligent writing, at best; it does not support reckless disregard for the truth. (Part II.C)

Because Professor Block cannot carry his burden to establish a genuine issue of material fact as to each element of his claims, his complaint must be dismissed, and The New York Times awarded attorneys' fees and costs. (Part III)

## I. PROFESSOR BLOCK MUST ESTABLISH A GENUINE ISSUE OF MATERIAL FACT AS TO EACH ELEMENT OF HIS CLAIMS.

The substantive law of Louisiana applies to this diversity action. *Henry v. Lake Charles American Press, L.L.C.*, 566 F.3d 164, 169 (5th Cir. 2009). Accordingly, Professor Block's complaint is subject to Louisiana Code of Civil Procedure article 971, Louisiana's anti-SLAPP statute. *Id.* ("Louisiana law, including the nominally-procedural Article 971, governs this diversity case.").[22] Pursuant to Article 971, a defendant may move to strike claims that arise from the defendant's exercise of First Amendment rights. To survive such motion, a plaintiff must prove, at the outset of his case, a "probability of success" on his claims:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established a probability of success on the claim.

La. Code Civ. Proc. art. 971(A)(1). "[A] prevailing party on a special motion to strike shall be awarded reasonable attorneys fees and costs." *Id.* art. 971(B).

The purpose of Article 971 is "to free defendants from the burden and expense of litigation that has the purpose or effect of chilling the exercise of First Amendment rights." *Henry*, 566 F.3d at 178. When the Louisiana legislature enacted Article 971 in 1999, it stated its intent to protect freedom of speech from abuse of the judicial process:

---

[22] Article 971 is Louisiana's anti-SLAPP statute. SLAPP is an acronym meaning "strategic lawsuit against public participation." SLAPP lawsuits can have the purpose or effect of chilling the exercise of First Amendment rights. In response to a growth in SLAPP lawsuits, state legislatures enacted statutes, such as article 971, to provide for the early dismissal of non-meritorious claims. *See generally Henry v. Lake Charles American Press, L.L.C.*, 566 F.3d 164 (5th Cir. 2009).

> The legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances. The legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process.

Sec. 2 of Acts 1999, No. 734. The Louisiana legislature intended for Article 971 to be construed broadly. *Id.* ("[I]t is the intention of the legislature that the Article enacted pursuant to this Act shall be construed broadly.") (emphasis added). *See also, e.g., Lee v. Pennington*, 830 So. 2d 1037, 1041 (La. App. 4th Cir. 2002), *writ denied*, 836 So. 2d 52 (La. 2003) ("Article 971 was enacted by the legislature as a procedural device to be used early in legal proceedings to screen meritless claims pursued to chill one's constitutional rights under the First Amendment of the United States Constitution to freedom of speech and press."); *Melius v. Keiffer*, 980 So. 2d 167 (La. App. 4th Cir. 2008) ("The Louisiana legislature enacted La. C.C.P. art. 971 'to screen out meritless claims pursued to chill one's constitutional rights under the First Amendment of the United States Constitution to freedom of speech and press.'"); *Lamz v. Wells*, 938 So. 2d 792, 796 (La. App. 1st Cir. 2006) ("The intent of Article 971 is to encourage continued participation in matters of public significance and to prevent this participation from being chilled through an abuse of judicial process."); *Darden v. Smith*, 879 So. 2d 390, 394 (La. App. 3d Cir. 2004) (article 971 was "enacted by the legislature to promote participation in matters of public concern"); *Johnson v. KTBS, Inc,* 889 So. 2d 329 (La. App. 2d Cir. 2004) (article 971 is "to be used in the early stages of litigation to screen out meritless claims brought primarily to chill the valid exercise of the constitutional rights of freedom of speech"); *Baxter v. Scott*, 847 So. 2d 225, 231-32 (La. App. 2d Cir.), *vacated as moot*, 860 So. 2d 535 (La. 2003) ("Article 971 is a procedural device to be used in the early stages of litigation to screen those claims which lack merit and which would chill public participation in matters of public interest."); *Stern v. Doe*,

806 So. 2d 98, 101 (La. App. 4th Cir. 2001) ("The intent of this statute is to encourage continued participation in matters of public significance and to prevent this participation from being chilled through an abuse of judicial process.").

Article 971, like most anti-SLAPP statutes,[23] operates as a burden-shifting statute. It requires, first, that a defendant establish that Article 971 applies. To do so, a defendant must "make a prima facie showing that the matter arises from an act in furtherance of his or her right of free speech or the right of petition and in relation to a public issue." *Darden*, 879 So. 2d at 396; La. Code Civ. Proc. art. 971(F)(1)(d) ("any conduct in furtherance of the exercise of the constitutional right of free speech in connection with a public issue or an issue of public interest" qualifies for article 971 protection). There is no dispute that Professor Block's claims arise from an act in furtherance of The New York Times' right of free speech, and in relation to a public issue. The publication of a news article is among the purest exercises of the right of free speech, and the article's subject matter — the intellectual forces shaping the political views of a United States Senator and potential candidate for president — is indisputably a matter of public interest. Article 971 unquestionably applies here, to both Professor Block's defamation and false light claims.[24]

Where Article 971 applies, the burden shifts to the plaintiff to "demonstrate a probability of success on his or her own claim." *Darden*, 879 So. 2d at 396; La. Code Civ. Proc. art. 971(A)(1). The Fifth Circuit directly addressed the meaning of "probability of success" late last year: In *Lozovyy v. Kurtz,* the Fifth Circuit held a plaintiff's burden under Article 971 is

---

[23] Numerous states have enacted anti-SLAPP statutes. See "State Anti-SLAPP Laws," Public Participation Project, Fighting for Free Speech, *available at* http://www.anti-slapp.org/your-states-free-speech-protection/ (last visited May 17, 2016) (reporting that 28 states have enacted some form of anti-SLAPP statute).

[24] Article 971 is not limited to a cause of action in defamation. *Darden*, 879 So. 2d at 395-96 (La. App. 3d Cir. 2004) ("We find no merit in the plaintiff's contention that Article 971 is limited to a cause of action in defamation….[T]he declaration of legislative intent indicates a desire for the Article to be 'construed broadly.'"). It applies equally to Professor Block's false light claim.

functionally equivalent to the non-movant's burden under Rule 56. *See Block*, 815 F.3d at 221 (citing *Lozovyy*, 813 F.3d at 568). Consistent with Rule 56, to survive an Article 971 special motion to strike post-*Lozovyy*, a plaintiff such as Professor Block need only establish a genuine dispute of material fact as to each element of his claims.

The Fifth Circuit in *Lozovyy* noted that "Article 971's 'probability of success' standard does not permit courts to weigh evidence, assess credibility, or resolve disputed issues of material fact." *Lozovyy*, 813 F.3d at 568. The question in *Lozovyy*, however, was not whether the alleged statement was false or capable of defamatory meaning — questions that, under Louisiana law, are properly decided by a court — but instead whether the alleged statement was ever made in the first place. That factual dispute was, naturally, outcome determinative, and required, for its resolution, that the district court improperly weigh competing evidence.[25]

Unlike in *Lozovvy*, the instant motion does not require a court to weigh evidence, assess credibility, or resolve disputed issues of material fact. The facts in this case were not and are not in dispute. The New York Times has not and does not ask this Court to decide disputed questions of fact; indeed, nothing in The New York Times' prior-filed motion was inconsistent with the standard the Fifth Circuit adopted in *Lozovvy*. As shown below, the undisputed facts and law foreclose Professor Block's claims. Considering the article as a whole and Professor Block's self-published views, there is no genuine issue of material fact as to whether Professor Block can prove falsity, defamatory meaning, or actual malice

---

[25] See *Lozovyy v. Kurtz,* No. 13-cv-424, 2015 WL 331804, at *2 (M.D. La. Jan. 26, 2015), in which the district court summarizes the factual dispute: "The central factual issue in this suit is whether, during the telephone call, the Defendants Kurtz and Klei defamed Lozovyy by stating that he destroyed and/or stole data. Defendants claim that, at no time in the conference call did Kurtz, Klei, or any other representative of LSU say or suggest that Lozovyy had destroyed and/or stolen any data. Four witnesses essentially attest to this fact-Kurtz, Klei, Valsaraj, and Scott. Plaintiff submits the affidavit of Peter Dowben, who also participated on the call. Dowben 'states that the defendants, Kurtz and Klei, affirmatively stated that Dr. Lozovyy had stolen or destroyed data of users of CAMD.' This is the only witness that Plaintiff has offered to the Court who allegedly heard the defamatory remarks directly from the Defendants." The district court concluded that "Plaintiff could only prevail if the Article 971 standard were that of a motion for summary judgment." *Id.* at *12.

## II. PROFESSOR BLOCK CANNOT ESTABLISH A GENUINE ISSUE OF MATERIAL FACT AS TO EACH ELEMENT OF HIS CLAIMS.

Falsity, defamatory meaning, and fault are essential elements of a defamation claim. *Kennedy v. Sheriff of E. Baton Rouge*, 935 So. 2d 669, 674 (La. 2006) (a defamation claim requires "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury"). Falsity and fault are also essential elements of a false light claim. *Simpson v. Perry*, 887 So. 2d 14, 16 (La. App. 1 Cir. 2004) (a false light claim requires "a privacy interest, falsity, and unreasonable conduct"). Further, because Professor Block is a public figure[26] and the matters in question are matters of public interest, to prove fault, he must prove actual malice by clear and convincing evidence. *Costello v. Hardy*, 864 So. 2d 129, 140-41 (La. 2004) (in defamation case involving public figure, fault requires actual malice); *Time, Inc., v. Hill*, 385 U.S. 374 (1967) (in false light case involving a matter of public interest, fault requires actual malice); *Tarpley v. Colfax Chronicle*, 650 So. 2d 738, 740 (La. 1995) (actual malice requires clear and convincing evidence).

"If even one of these elements is lacking, the cause of action fails." *Kosmitis v. Bailey*, 685 So. 2d 1177, 1180 (La. App. 2 Cir. 1996) (citing, *e.g., Sassone v. Elder*, 626 So. 2d 345, 352 (La. 1993)). As shown, Professor Block's claims fail for any one of three independent reasons: There is no genuine issue of material fact as to falsity, there is no genuine issue of material fact as to defamatory meaning, and there is no genuine issue of material fact as to actual malice.

---

[26] Professor Block is a public figure, at a minimum, for the limited purposes of this lawsuit because he voluntarily injected himself in the public controversy at issue. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). Professor Block has never disputed that he is a public figure for the purposes of this lawsuit.

## A.    THERE IS NO GENUINE ISSUE OF MATERIAL FACT AS TO FALSITY.

There is no genuine issue of material fact as to falsity.  *Kennedy*, 935 So. 2d at 674 (La. 2006) (falsity is an essential element of a defamation claim); *Simpson*, 887 So. 2d at 16 (falsity is an essential element of a false light claim).[27]    Indeed, in blog posts Professor Block published on the Internet just days after the article was published, he agreed, "I did indeed use the exact words the NY Times quoted me as saying."

The article quotes Professor Block twice.  In the first instance, the article states:

One economist, while faulting slavery because it was involuntary, suggested in an interview that the daily life of the enslaved was "not so bad—you pick cotton and sing songs."[28]

In the second instance, which refers to the first, the article states:

Walter Block, an economics professor at Loyola University in New Orleans who described slavery as "not so bad," is also highly critical of the Civil Rights Act. "Woolworth's had lunchroom counters, and no blacks were allowed," he said in a telephone interview.  "Did they have a right to do that?  Yes, they did.  No one is compelled to associate with people against their will."[29]

These two passages accurately convey the view, which Professor Block has self-published elsewhere,[30] that the problem with slavery was it was "involuntary," otherwise it was "not so bad."  Neither the first nor second passage quotes Professor Block as saying slavery was "good."  The article therefore does not falsely represent that he is a "proponent" of or otherwise

---

[27] A defamation plaintiff furthermore has the burden to prove falsity by a preponderance of the evidence.  *Rachal v. Dep't. of Wildlife & Fisheries*, 918 So. 2d 570, 574-75 (La. App. 3d Cir. 2005); *Thompson v. Lee*, 888 So. 2d 300, 304 (La. App. 2d Cir. 2004) (truth is an absolute defense).  "Proof by a preponderance of the evidence is sufficient when the evidence, taken as a whole, shows that the fact sought to be proved is more probable than not."  *See, e.g., Daniel v. House of Raeford Farms of La.*, 23 So. 3d 374, 379 (La. App. 2d Cir. 2009).

[28] Exhibit A to the Declaration of Sam Tananhaus at pp. 2-3.

[29] Exhibit A to the Declaration of Sam Tananhaus at p. 10.

[30] Exhibit B to the Declaration of Lori Mince (Walter E. Block, "Chris Selley Is a Pussy Libertarian; I'm not," LewRockwell.com, February 25, 2013); Exhibit D to the Declaration of Lori Mince (Walter Block, "Walter Block: How NYT Mischaracterized My Views on Slavery (And What I Tried To Do About It)," EconomicPolicyJournal.com, January 30, 2014); Exhibit E to the Declaration of Lori Mince (Walter Block, "Scurrilous, Libelous, Venomous," LibertyCrier.com, January 31, 2014).

"supports" slavery. As this Court observed in its prior ruling, "[t]he text, taken to the extreme, would merely support an accusation that Block supports free enterprise at all costs."[31]

Professor Block asks the Court to read the article's second passage — which quotes him as saying slavery is "not so bad" — in isolation. He asks that the Court ignore altogether the first passage, which notes, accurately, that he faults slavery "because it was involuntary." It is a fundamental matter of law, however, that an article must be read as a whole. *E.g, Britton v. Hustmyre*, 2009-0847 (La. App. 1 Cir. 3/26/10), 2010 WL 1170222, *8 (refusing to read statements in article in isolation; "[W]hen the statements complained of are read in the context of the magazine article as a whole, and considering the effect the article as a whole would have on the average reader, Mr. Britton's probability of proving falsity has not been established.") (quoting *Sassone*, 626 So. 2d at 352; *Kosmitis*, 685 So. 2d at 1180; *Taylor v. Town of Arcadia*, 519 So. 2d 303, 306 (La. App. 2 Cir.), *writ denied*, 522 So. 2d 1097 (La. 1988)). *See also, e.g., Bell v. Roger*, 698 So. 2d 749, 756 (La. App. 2 Cir. 1997) (refusing to read words "misappropriate use of property" in isolation); *Cortez v. Shirley*, 555 So. 2d 577, 580 (La. App. 1 Cir. 1989) (refusing to read erroneous statement in article that misidentified plaintiff as a rapist in isolation); *Dyer v. Davis*, 189 So. 2d 678, 687 (La. App. 1 Cir. 1966), *writ refused*, 197 So. 2d 79 (La. 1967) (refusing to read statement in article that characterized plaintiff as "an ignorant man who lets the public think he is a lawyer" in isolation). Accordingly, Professor Block cannot read the article's second passage in isolation. The second passage must be read in conjunction with the first passage, which Professor Block cannot, and does not, allege is untrue.[32]

---

[31] R. Doc. 23 at pp. 9-10.

[32] To the extent Professor Block argues a reasonable reader would not know to read the article's two passages together, Professor Block does not give reasonable readers their due: A reader would have to read the first passage to get to the second, and the use of the striking quotation that slavery is "not so bad" would hardly be forgotten by the reader when they came across it again in the same story. The second passage ("Walter Block, an economics

More importantly, even if the second passage is read in isolation, it is, at a minimum, still substantially true. Defamation law gives defendants, and in particular news media defendants, "breathing space." *Hopkins v. Keith*, 348 So. 2d 999, 1002 (La. App. 2 Cir. 1977). An error, to justify liability, must be significant. *Id.* Given the record of Professor Block's self-published views, Professor Block cannot credibly contend the second passage, even if read in isolation, is "a significant variation from the truth." *Id.*[33] Put simply, Professor Block has represented, repeatedly, that slavery was "not so bad," and that is what The New York Times reported.

In sum, the article does not falsely represent that Professor Block is a "proponent" of or otherwise "supports" slavery; additionally, the article truthfully conveys Professor Block's view that the problem with slavery was it was "involuntary." Nevertheless, even if the article quoted Professor Block as saying slavery was "not so bad" only, the quote would still be substantially true. Because there is no genuine issue of material fact as to falsity, Professor Block's claims must be dismissed.

## B. THERE IS NO GENUINE ISSUE OF MATERIAL FACT AS TO DEFAMATORY MEANING.

There also is no genuine issue of material fact as to defamatory meaning, *Kennedy*, 935 So. 2d at 674 (defamatory meaning is an essential element of a defamation claim), both because

---

professor … who described slavery as 'not so bad'") clearly references the first ("[o]ne economist … suggested in an interview that the daily life of the enslaved was 'not so bad'").

[33] Louisiana courts have applied the substantial truth doctrine in a number of cases including, for example, in cases alleging a televised newscast impugned a substance abuse counselor's character, *Fitzgerald v. Tucker*, 737 So. 2d 706 (La. 1999) (possible factual inferences were all "substantially true"; "there is nothing provably false"); alleging a newspaper article defamed an obstetrician by reporting that Louisiana's women were "being butchered," *Romero v. Thomson Newspapers (Wisconsin), Inc.*, 648 So. 2d 866 (La. 1995) ("What The Daily Advertiser said about Dr. Romero was substantially true. Counsel could not pinpoint false statements in oral argument or brief."); alleging a newspaper article defamed a disbarred attorney by reporting that he had been convicted of cheating insurance companies and his clients, *Drury v. Feeney*, 505 So. 2d 111 (La. App. 4 Cir. 1987) (although technically erroneous, "the newspaper article was substantially true"); and alleging a newspaper headline defamed a physician by representing that he had been indicted for distribution of narcotics, when he was indicted for distribution of amphetamines, *Rosen v. Capital City Press*, 314 So. 2d 51 (La. App. 1 Cir. 1975).

18

(i) the article does not carry the meaning Professor Block assigns to it, and (ii) in Louisiana a plaintiff can recover for defamation by implication only where private individuals and private affairs are concerned.

### i. The article does not carry the meaning Professor Block assigns to it.

Under Louisiana law, whether words are capable of defamatory meaning is a question of law for a court to decide. *See Guimbellot v. Rowell*, 184 F. App'x 447, 450 (5th Cir. 2006) ("Louisiana law is clear that courts make the initial inquiry whether words are objectively capable of defamatory meaning.") (quoting *Guilbeaux v. Times of Acadiana, Inc.*, 661 So. 2d 1027, 1031 (La. App. 3 Cir. 1995)); *Hamilton v. Dennis*, No. 09-cv-7029, 2011 WL 2844211, at *7 (E.D. La. July 15, 2011) ("[W]hether a communication is capable of a particular meaning and whether that meaning is defamatory is a question for the court.") (quoting *Sassone*, 626 So. 2d at 352; *Guilbeaux*, 661 So. 2d at 1031); *Sigur v. Emerson Process Mgmt.*, No. 05-cv-1323, 2007 WL 1891124, at *2 (M.D. La. July 2, 2007) ("The question of whether a communication is capable of a particular meaning and whether that meaning is defamatory is one for the court.") (quoting *Sassone*, 626 So. 2d at 352); *Costello*, 864 So. 2d at 140 (same); *Bussie v. Lowenthal*, 535 So. 2d 378, 382 (La. 1988) (same); *Dietz v. Dietz*, 165 So. 3d 342, 360 (La. App. 3 Cir. 2015) (same); *Sullivan v. Malta Park*, 156 So. 3d 1200, 1211 (La. App. 4 Cir. 2014) (same); *Cooksey v. Stewart*, 938 So. 2d 1206, 1211 (La. App. 2 Cir. 2006) (same); *Lamz v. Wells*, 938 So. 2d 792, 798 (La. App. 1 Cir. 2006) (same); *St. German v. Coulon*, 887 So. 2d 608, 612 (La. App. 5 Cir. 2004) (same); *Bell*, 698 So. 2d at 754 (same); *Kosmitis*, 685 So. 2d at 1180 (same).

"The question for the court in determining whether words have a defamatory meaning is whether a third person hearing the communication would have reasonably understood the communication, taken in context, as intended in a defamatory sense." *Davis v. Borskey*, 660 So.

2d 17, 22 (La. 1995) (citing *Sassone*, 626 So. 2d at 352).  Like for falsity, in determining whether

an article carries defamatory meaning, a court must consider the article as a whole.  *Cortez*, 555

So. 2d at 579 ("To determine if the words can be construed to have a defamatory meaning in

relation to plaintiff, the article in question must be viewed as a whole.").

Considering the article as a whole, the article does not carry the meaning Professor Block

assigns to it.  Professor Block contends the article represents him as an advocate of slavery and a

racist, and therefore is defamatory *per se*.  As already shown, however, the article nowhere states

that Professor Block is a proponent of slavery or a racist; it does not even state that Professor

Block thinks slavery is "good."[34]  Rather, the article accurately reports Professor Block's opinion

that slaves were permitted to "pick cotton and sing songs" and that this existence was "not so

bad."

The article also cannot be reasonably understood as intended in a defamatory sense.  As

this Court observed in its prior ruling, a reasonable reader, considering the article as a whole,

would not draw the principal inference that Professor Block is an advocate of slavery or a

racist.[35]  The article states instead that Professor Block "objects to slavery on principle as

involuntary" and "objects to the [Civil Rights] Act on the basis of the constitutional right to be

free from association."[36]

In his appeal of the Court's prior ruling, Professor Block argued that this Court, in

determining whether the article carried the defamatory meaning Professor Block assigned to it,

disregarded evidence that the article subjected Professor Block to unwarranted ridicule.  He

---

[34] Because the article is not defamatory *per se*, Professor Block's claim is necessarily one for defamation by implication — that is, his claim is that the article *implies* that he is a proponent of slavery or a racist.  Indeed, as expressly alleged in his complaint, Professor Block's claim is plainly one for defamation by implication.  R. Doc. 1 at ¶ 10 (alleging the article uses "innuendo" and takes his words "out of context" to paint him as a racist).

[35] R. Doc. 23 at pp. 11.

[36] R. Doc. 23 at pp. 9-10.

alleged the president of Loyola University New Orleans publicly opined, in Professor Block's words, that Professor Block believes "*involuntary chattel slavery* is 'not so bad.'"[37]  He alleged he was accosted by two individuals on Loyola's campus "who threatened him with physical harm" because they believed, in Professor Block's words, that Professor Block had said "slavery was ok."[38]  But there is no evidence the two individuals who allegedly accosted Professor Block ever read the article in question. It is as likely that they were responding to other sources of Professor Block's views.  And the president of Loyola is far from an "average" reader of the article; he is the chief executive of the university that employs Professor Block, and his statement was a response to the controversy Professor Block's views, including, in large part, Professor Block's views on the Civil Rights Act, had caused on campus.[39]  These views, as shown, were already self-published by Professor Block on the Internet.

In any event, in Louisiana, the determination of the article's meaning unquestionably rests with a court.  This Court's determination, in its prior ruling, that the article does not carry defamatory meaning was not erroneous. "The text, taken to the extreme, would merely support an accusation that Block supports free enterprise at all costs."[40]

   *ii. In Louisiana a plaintiff can recover for defamation by implication only where private individuals and private affairs are concerned.*

Separately, even if the article carried the meaning Professor Block assigns to it, Professor cannot recover for defamation by implication under Louisiana law, which mandates that a plaintiff can recover for defamation by implication only where private individuals and private

---

[37] See Professor Block's appellant's brief filed July 21, 2015, at p. 39.
[38] See Professor Block's appellant's brief filed July 21, 2015, at p. 39.
[39] R. Doc. 17-1 at pp. 40-45.
[40] R. Doc. 23 at pp. 9-10.

21

matters are concerned.[41]  For this independent reason, Professor Block's defamation claim should be dismissed.

The Louisiana Supreme Court first held a plaintiff cannot recover for defamation by implication where the publication's subject matter involves public figures and public affairs in *Schaefer v. Lynch*, 406 So. 2d 185 (La. 1981).  In that case, the plaintiff admitted that facts published by the defendant were true, but complained that the publication falsely implied unethical or unlawful behavior.  Reversing the trial court, the Louisiana Supreme Court held: "Where public officers and public affairs are concerned, there can be no libel by innuendo."  *Id.* at 188.

Twelve years later, the Louisiana Supreme Court touched on the issue again in *Sassone v. Elder*, 626 So. 2d 345, 352 (La. 1993), observing that "[w]hen a public figure and matter of public concern are involved, perhaps there can be no defamation by implication."  *Id.* at 354.

Six years after *Sassone*, the Louisiana Supreme Court decided *Fitzgerald v. Tucker*, 737 So. 2d 706 (La. 1999).  The Louisiana Supreme Court affirmed the rule that a plaintiff cannot recover for defamation by implication where the publication in question involves matters of public concern: "[T]ruthful facts which carry a defamatory implication can only be actionable if the statements regard a private individual *and* private affairs. 'Where public officers and public

---

[41] In his appeal of this Court's prior ruling, Professor Block suggested that Louisiana's limits on liability for defamation by implication are inconsistent with the First Amendment.  See Professor Block's appellant's brief filed July 21, 2015, at p. 41.  That suggestion misunderstands the First Amendment.  The First Amendment limits liability in defamation cases; it does not enlarge it.  *Cf. New York Times v. Sullivan*, 376 U.S. 254, 283 ("[T]he Constitution delimits a State's power to award damages for libel …"); *Kennedy v. Sheriff of E. Baton Rouge*, 2005-1418 (La. 7/10/06), 935 So. 2d 669, 677 ("[W]hile the states remain free to establish their own standards of liability for a publisher of defamatory falsehoods injurious to a private individual, the protections afforded by the First Amendment supercede the common law presumptions of fault, falsity, and damages with respect to speech involving matters of public concern, at least insofar as media defendants are concerned.").  To the extent states recognize liability for defamation, they may do so only within the First Amendment's permissible bounds, as articulated by the United States Supreme Court.  But states may limit, indeed even abolish, liability for defamation if they want.

affairs are concerned, there can be no libel by innuendo.'" *Id.* at 717 (quoting *Shaefer*) (emphasis in original).

The article in question does not involve private individuals and private affairs. Its subject matter is plainly a matter of public concern, and Professor Block does not dispute that he is a public individual for this lawsuit's purposes. Under *Schaefer*, *Sassone*, and *Fitzgerald*, Professor Block cannot recover for defamation by implication.

In sum, because the article does not carry the meaning Professor Block ascribes to it, and, separately, because Louisiana law forecloses a claim for defamation by implication under these circumstances, there is no genuine issue of material fact as to defamatory meaning.

## C. THERE IS NO GENUINE ISSUE OF MATERIAL FACT AS TO ACTUAL MALICE.

Finally, there is no genuine issue of material fact as to actual malice. *Kennedy*, 935 So. 2d at 674 (fault is an essential element of a defamation claim); *Simpson*, 887 So. 2d at 16 (unreasonable conduct is an essential element of a false light claim); *Costello*, 864 So. 2d at 140-41 (in defamation case involving public figure, fault requires actual malice); *Hill*, 385 U.S. 374 (in false light case involving a matter of public interest, fault requires actual malice).

Professor Block cannot prove actual malice at all, much less with clear and convincing evidence. *Tarpley*, 650 So. 2d at 740 (actual malice requires clear and convincing evidence). Actual malice requires proof that a defendant made a defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Trentecosta v. Beck*, 96-2388 (La. 10/21/97), 703 So. 2d 552, 561 (quoting *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964)). As a threshold matter, the article is not false; as already shown, it truthfully represents Professor Block's views.

There also is no evidence of a reckless disregard of the truth. Professor Block concedes that he used the "exact words" attributed to him. He must also acknowledge that the article's two passages, when read together, truthfully convey his view that the problem with slavery was it was "involuntary," otherwise it was "not so bad." What Professor Block really contends, then, is not that the article was untrue but that The New York Times did not present his views as directly or clearly as he would have liked. Specifically, he complains that the first passage's explanation that he faults slavery because "it was involuntary" is too far removed from the second passage; he wishes the two passages would have been closer together. That contention arguably supports negligent writing, at best; it does not support reckless disregard of the truth.

While actual malice can be a question of fact, there simply is no question of fact as to actual malice here. As this Court properly observed in its prior ruling, there is "no evidence to suggest that the defendants acted with actual malice in publishing the article. Defendants contacted Block for an interview and quoted him directly."[42]

## III.    THE NEW YORK TIMES IS ENTITLED TO ATTORNEYS' FEES AND COSTS.

Because Professor Block cannot carry his burden as to either of his claims, his complaint must be dismissed, and The New York Times awarded attorneys' fees and costs.

Article 971 provides that "a prevailing party on a special motion to strike shall be awarded reasonable attorneys fees and costs." La. Code Civ. Pro. art. 971(B). Such awards are mandatory, *see e.g., Alexanian v. Brown*, No. 07-cv-00806, 2010 WL 103609, at *3 (W.D. La. Jan. 7, 2010) ("The undersigned reads La. C.C.P. art. 971's provision for an award of attorney fees and costs as mandatory — 'a prevailing party in a special motion to strike shall be awarded attorney fees and costs.'"); *Darden*, 879 So. 2d at 400 ("In light of the mandatory language of the

---

[42] R. Doc. 23 at p. 12.

article, we award attorney's fees and costs."); *Lee*, 830 So. 2d at 1046 ("[t]he language of the statute is clear that attorney fees *must* be awarded to the prevailing defendant"), and common, *see, e.g., Hebert v. Louisiana Licensed Professional Vocational Rehabilitation Counselors*, 4 So. 3d 1002 (La. App. 3d Cir. 2009) (awarding $2,500 in attorneys fees to party that prevailed only in part in special motion to strike); *Gwandiku v. State Farm Mut. Auto Ins. Co.*, 972 So. 2d 334 (La. App. 3d Cir. 2007) (reversing trial court and increasing attorneys fees award to $4,001.00, plus $739.16 in costs, to party that prevailed in special motion to strike); *Estiverne v. Times–Picayune, L.L.C.*, 950 So. 2d 858 (La. App. 4th Cir. 2006) (awarding $4,000 in attorneys fees to party that prevailed in special motion to strike); *Davis v. Benton*, 874 So. 2d 185, 191 (La. App. 1st Cir. 2004) (noting award of attorney fees is mandatory and awarding $5000 in attorneys fees to party that prevailed in special motion to strike).

The New York Times is entitled to an award of attorneys' fees and costs, in an amount to be proven at a subsequent hearing, and The New York Times reserves the right to seek an award that compensates it for the attorneys' fees and costs it incurred both pre- and post-appeal.

## CONCLUSION

The undisputed facts and law foreclose Professor Block's claims. To the extent Professor Block was injured by article, it was not because the article was false. The article merely introduced Professor Block and his views to a wider audience; it said to a large audience of New York Times readers what Professor Block has repeatedly said to a smaller audience of libertarian-blog readers before. The choice of words was The New York Times' to make.[43] Here, however, the words were Professor Block's own.

___

[43] *E.g., Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 685-86 (9th Cir. 1990) ("Complaints or disagreements about choice of language are editorial decisions that do not give rise to liability."); *Janklow v. Newsweek, Inc.*, 788 F. 2d 1300, 1306 (8th Cir. 1986) ("We believe that the First Amendment cautions courts against intruding too closely into

For all the reasons stated herein, the Court must strike Professor Block's complaint and award The New York Times reasonable attorneys' fees and costs in an amount to be proven.

Respectfully submitted,

   /s/ Alysson L. Mills
Loretta G. Mince, 25796
Alysson L. Mills, 32904
FISHMAN HAYGOOD, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2016, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

   /s/ Alysson L. Mills

---

questions of editorial judgment, such as the choice of specific words.") (citing *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974)).

1039348v.1

# ATTACHMENTS

| | |
|---|---|
| | **Declaration of Sam Tanenhaus** |
| Ex. A | Sam Tanenhaus and Jim Rutenberg, *Rand Paul's Mixed Inheritance*, N.Y. Times, January 25, 2014, *available at* http://www.nytimes.com/2014/01/26/us/politics/rand-pauls-mixed-inheritance.html (last visited March 5, 2015) |
| | **Declaration of Lori Mince** |
| Ex. A | James Gill, "James Gill: Loyola economics chair Walter Block ignites furor for asserting that women, blacks less productive in workplace,"  The Times-Picayune ǀ Nola.com, November 26, 2008, *available at* http://blog.nola.com/jamesgill/2008/11/a_tough_sell_in_the_marketplac.html (last visited March 5, 2015) |
| Ex. B | Walter E. Block, "Chris Selley Is a Pussy Libertarian; I'm not," LewRockwell.com, February 25, 2013, *available at* http://www.lewrockwell.com/2013/02/walter-e-block/chris-selley-is-a-pussy-libertarian-imnot/ (last visited March 5, 2015) |
| Ex. C | Walter E. Block, "Sue New York Times for libel?!?!," LewRockwell.com, February 1, 2014, at 4:22 p.m., *available at* http://www.lewrockwell.com/lrc-blog/sue-new-york-times-for-libel (last visited March 5, 2015) |
| Ex. D | Walter Block, "Walter Block: How NYT Mischaracterized My Views on Slavery (And What I Tried To Do About It)," EconomicPolicyJournal.com, January 30, 2014, *available at* http://www.economicpolicyjournal.com/2014/01/walter-block-how-nyt-mischaracterized.html (last visited March 5, 2015) |
| Ex. E | Walter Block, "Scurrilous, Libelous, Venomous," LibertyCrier.com, January 31, 2014, *available at* http://libertycrier.com/scurrilous-libelous-venomous/ (last visited March 5, 2015) |
| Ex. F | Robert Morris, "Professor's defense of segregated lunch counters creates controversy at Loyola University," UptownMessenger.com, February 20, 2014, *available at* http://uptownmessenger.com/2014/02/professors-defense-of-segregated-lunch-counters-creates-controversy-at-loyola-university/ (last visited March 5, 2015) |